**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **R.S. and R.S., Individually and on** | : | **CIVIL ACTION** |
| **Behalf of J.S., a minor** | : | |
| | : | |
| | : | |
| **v.** | : | |
| | : | |
| **LOWER MERION SCHOOL DISTRICT** | : | **NO. 22-3478** |

<u>**MEMORANDUM OPINION**</u>

**Savage, J.**                                                              **March 6, 2023**

In the typical action brought under the Individuals with Disabilities Education Act ("IDEA"), the parents complain that the school district does not offer enough support to provide their disabled child a free and appropriate public education.  That is not the case here.

The parties disagree on what the appropriate high school placement was for J.S., a disabled child with bipolar disorder.  The Lower Merion School District offered an out-of-district school providing intensive therapeutic, behavioral, emotional and social supports.  Disagreeing that J.S. needed that much support, the parents enrolled him in a private school providing one-on-one instruction and having no mental health professionals on staff.  After a due process hearing, the hearing officer decided the school district's proffered placement was appropriate and the parents' was not.

The parents and the District cross-moved for summary judgment on the administrative record.  After an independent review of the administrative record and deferring to the findings of the hearing officer, we conclude that the school district's proffered placement was appropriate at the time.  Therefore, we shall affirm the hearing officer's decision.

**Factual Background**

J.S. was a student at Lower Merion School District ("District") from kindergarten to the eleventh grade when his parents enrolled him in a private school.  From the third grade until the eleventh grade, he engaged in oppositional and defiant behavior that disturbed and disrupted teachers and other students.  He was evaluated several times throughout those years and was sometimes provided special education support.

Problems arose in the third grade when J.S. acted out, pointing at other students with his fingers mimicking a gun and throwing food at them.  J.S. was evaluated to determine whether he was eligible for special education.  The evaluation revealed that J.S. was a child with a disability in need of special education for an Other Health Impairment related to attention and executive functioning impairments, and an Emotional Disturbance for his oppositional and defiant behavior.

In fifth grade, an Individualized Education Program ("IEP") team referred him for a re-evaluation after concerns of increasing anxiety, executive functioning problems, and excessive absences.  The re-evaluation, which did not occur until the following year in sixth grade, included information and input from teachers and the parents.  Testing revealed that the parents had significantly different assessments of J.S.'s behavioral problems. So did the teachers.  As to focusing and impulse control, J.S.'s mother placed him in the elevated range or very elevated range in all domains except for learning problems and conduct problems.  His father saw him as normal, except for conduct.

Despite their inconsistent assessments, the parents agreed that his problems impacted his academic performance.

J.S.'s reading teacher rated him in the average range in all domains. His Social Studies teacher rated him in the very elevated range for defiance/aggression, emotional liability, and oppositional defiant disorder. J.S. rated himself as hyperactive. With respect to behaviors related to executive function, the teachers rated him as average. Again, the parents' perspectives were inconsistent. His mother rated her son's needs above average in many areas. His father saw no elevated needs.

The evaluator concluded that J.S. did not exhibit behaviors that impeded his or other students' learning. She determined that when he is in school, he performs well. The evaluator attributed J.S.'s problems to excessive absences. Accordingly, she concluded J.S. did not qualify for special education services and did not require specially designed instruction.

The District, concluding that J.S. had an attendance problem, not a behavioral or learning problem, offered the parents a referral to third-party agencies to provide at-home services to address the attendance issue. The parents rejected the offer, instead relying on private providers. They refused to allow the District to communicate with those providers.

J.S.'s attendance did not improve in the seventh grade. In three quarters, he accumulated twenty-seven missed days and sixty-four late days, resulting in various suspensions.

At the parents' request, the District re-evaluated J.S. This time the parents' ratings were farther apart, with his father rating his son average across the board and his mother

rating him average in only three of ten domains.  She rated her son very elevated in attention, defiance/aggression, and oppositional defiant behavior.

Two teachers rated J.S. similarly to his mother.  Considering these ratings, the evaluator concluded J.S. had significant difficulty exhibiting thoughts and behaviors that can interfere with work, significant problems regulating behavior, and significant problems with working memory and organizing work materials.  She further found that J.S.'s behavior was consistent with a diagnosis of oppositional defiant disorder, a form of social maladjustment, not an emotional disturbance qualifying him for special education services.  Nonetheless, she concluded that although J.S. was a child with a disability, he was not in need of special education.

The parents retained a private psychologist to evaluate J.S.  The private psychologist diagnosed general anxiety disorder, moderate unspecified depressive disorder, ADHD, and oppositional defiant disorder.  He noted J.S. was unable to manage his emotions, lacked social skills and overreacted.  Among his recommendations was school support, specifically, special education services to address J.S.'s ADHD, hyperactivity and oppositional defiant disorder.

The parents shared this report with the District, instigating a re-evaluation in the eighth grade.  Testing results showed no change in prior tests.  The evaluator found that J.S. was doing better in behavior and attendance, and found no evidence of anxiety and depression causing oppositional defiant disorder.  Again, finding that J.S. did not qualify

for special education, she recommended he remain in regular education despite the private psychologist's recommendation of special education services.

Ninth grade brought a change at the same time COVID hit.  J.S.'s attendance and tardiness improved significantly, and he had no disciplinary infractions.  But, teachers noticed signs of a problem.  J.S. had a troubling demeanor, and appeared "down", "sad", and "lethargic."[1]  He demonstrated an increasing loss of interest in school.  Yet, he completed the ninth-grade year in the A+ to B range and achieved honors-level academics.  The District did not re-evaluate J.S.

In tenth grade, after returning to in-person school, J.S.'s attendance began falling off and his math teacher reported that he was impulsive and disrespectful.  His misbehavior was escalating.  In March, J.S. brought a plastic rendition of a martial arts weapon into school.  The teacher also reported J.S.'s oppositional defiance and inability to understand the perspective of others, poor attendance, incomplete work and missing tests.  J.S.'s grades plummeted to a D+ in English and an F in Math, while remaining in the A+ to B range in other subjects.

In October of his eleventh grade, a school counselor made a START[2] referral based upon his failing grade in Spanish, incomplete work assignments in Math, and disruptive behavior in both classes.  A month later, on November 16, 2021, his History and Spanish teachers made disciplinary referrals.  The History teacher wrote that "[J.S.] does this type of thing [(leaving class and not returning)] all the time."[3]  The Spanish

---

[1] Final Decision & Order at 17, ¶ 86 (Aug. 28, 2022), ECF No. 11-3 ["Final Decision"].

[2] START is a student assistance program designed to address family concerns, substance abuse, eating disorders, anxiety, stress, and depression.  Evaluation Report for J.S. at 11–12 (Mar. 17, 2022), ECF No. 11–12 at 184–236 ["2022 ER"].

[3] Final Decision at 19, ¶ 103.

teacher reported that "[J.S.] was talking loudly during class.  Moved from desk to desk.  Refused to leave the other students alone even when asked by them.  [J.S.] took out his yo[-]yo and started playing."[4]

The next day, the Spanish teacher made another disciplinary referral, citing the same disruptive behavior.  Two days after that, both the Math and Spanish teachers filed disciplinary forms.

Over the weekend of November 19 through 22, 2021, J.S. suffered a manic episode with severe psychotic features.  The District received emails and reports from eight community members through the safe-to-say reporting system.  The reports documented bizarre, threatening and inappropriate behavior.[5]

J.S. sent a disturbing email to two teachers:

> F*** YOU

---

[4] *Id.*

[5] The reports were:

- "Caller reported that on 11/20/21 her daughter had friends over and people continued to come.  This [J.S.] came and was told to leave and he refused.  Today he is sending messages to everyone over Snapchat that he is going to shoot all of them and shoot up the school."  Safe2Say Something Report (Nov. 20, 2021, 6:24 PM), ECF No. 11-11 at 160.

- "[J.S.] has been non[-]stop harassing multiple people online this past weekend from 11/19/21-today 11/21/21.  He has made multiple sexual comments about people lying about things he has done with them or asking inappropriate questions even when asked to stop.  He has also been racist to many members of the [A]sian community making fun of their facial features."  Safe2Say Something Report (Nov. 21, 2021, 8:15 PM), ECF No. 11-11 at 165.

- J.S. "is constantly harassing girls[,] spreading their personal info online[,]. . . refusing to take it down[,] and lying about sexual encounters that he has had."  Safe2Say Something Report (Nov. 21, 2021, 8:36 PM), ECF No. 11-11 at 168.

- J.S. "had himself a weekend.  To start he broke into multiple kids houses uninvited.  [O]n one occasion he was kicked out, and then figured out a way back inside until the parent had to kick him out.  He then stood outside the house for an hour or so.  He then followed multiple students to a second house and did the same exact thing.  He then supposedly broke into a student[']s house at 2am when that student was not home.  He has since made multiple threats to students saying he will quote beat them up and kill them.  Multiple cases of harassment and other instances where the student has been saying stuff to kids.  He made jokes about students['] dead dads and has been sending explicit pictures to students.

I WILL SEE YOU IN COURT
HOPEFULLY YOU LEARNED ANOTHER SKILL AT UPENN
AND HOPEFULL JOE HAS ENOUGH PENSION

Sincerely,
The smartest student at Lower Merion[6]

J.S. was hospitalized on November 22, 2021.  He was admitted to the Horsham

Clinic on November 24, 2021, where he received a preliminary working diagnosis of

---

He has made threats against the school and has claimed to have weapons."  Safe2Say Something Report (Nov. 22, 2021, 6:11 PM), ECF No. 11-11 at 171.

- "Student has been going crazy all weekend and claiming to have a gun and has threaded [sic] to shoot up the school on top of everything else he has said."  Safe2Say Something Report (Nov. 22, 2021, 6:26 PM), ECF No. 11-11 at 172.

- "He has threatened to kill multiple kill [sic] at our school.  He has said he has guns and will kill them with it.  I am scared for my life and others['] safety."  Safe2Say Something Report (Nov. 22, 2021, 6:27 PM), ECF No. 11-11 at 173

- "a junior at [L]ower [M]erion [H]igh by the name of [J.S.] school [sic] is making numerous threats against multiple peoples['] lives and he said that he will bring guns to school.  Although [I] do not attend [L]ower [M]erion [H]ighschool [sic], [I] am very concerned for the health and saftey [sic] of those who do."  Safe2Say Something Report (Nov. 22, 2021, 7:35 PM), ECF No. 11-11 at 174.

- J.S. "has threatened to shoot up both [L]ower [M]erion and [H]arriton as well as kill multiple students at each.  [H]e has been throwing his life away saying things on social media and has falsely accused people of sexual assault.  [H]e seems serious and off the walls and the police already spoke to him today.  [M]any other reports have happened today a[b]out this but it[']s very serious something is wrong."  Safe2Say Something Report (Nov. 22, 2021, 8:40 PM), ECF No. 11-11 at 176.

- "Grade 11 student [J.S.] is making threats on Snapchat, threatening to shoot up the school, via his story and messages sent to other students (which have been screenshotted by several users).  I've been added to some group chats with students who are concerned for their safety tomorrow, but others think he just wants attention.  It's unclear whether he actually has any weapons/means to commit an act of violence."  Safe2Say Something Report (Nov. 22, 2021, 8:44 PM), ECF No. 11-11 at 181.

- J.S. "(grade 11) has threatened multiple times to shoot up Lower Merion HS as well as the sister school Harriton HS.  He has claimed he owns multiple kinds of guns and threatened specific kids in grade 11 all claiming he'd kill them.  He has also ideated killing himself along with shooting school(s) down."  Safe2Say Something Report (Nov. 22, 2021, 10:20 PM), ECF No. 11-11 at 182.

- "There is a rumor going around that [a] boy named [redacted] is threatening to shoot in school.  It was talked about in group chats.  Please make sure to check it.  He might be Junior we are not sure.  THIS IS SERIOUS.  I am a concerned parent.  THIS IS SERIOUS."  Safe2Say Something Report (Nov. 22, 2021, 10:52 PM), ECF No. 11-11 at 189.

[6] Email from J.S. to Joe Callahan & Tara Pellegrino (Nov. 22, 2021, 7:08 PM), ECF No. 11-12 at 107.

"ADHD by history, Unspecified Bipolar disorder.  Rule out, Bipolar disorder, manic with psychotic features."[7]  J.S. was discharged from the Horsham Clinic on December 2, 2021. Upon discharge, he was prescribed 5 mg of Abilify at bedtime and directed to follow up with Dr. Robert Klein of White Marsh Psychiatry the following day.

On December 16, 2021, J.S. had a second manic episode.  Four days later, in response to his parents calling 911, J.S. was taken to the Bryn Mawr Hospital Emergency Room where he was placed in restraints for one day.  On December 22, 2021, J.S. entered Montgomery County Youth Center ("MCYC") where he remained until January 19, 2022.  While at MCYC, J.S. had a third manic episode.

After his first manic episode, J.S. began treating with Dr. Robert L. Klein, a clinical psychologist, and Dr. Katie Hoeveler, a psychiatrist focusing on child and adolescent psychiatry.

Between December 7 to 19, 2021, J.S. had six telehealth sessions with Dr. Klein. Dr. Klein shared his findings in his Psychological Report, dated December 19, 2021:

> Diagnoses: Manic-Depression, ADHD, R/O Disruptive Mood Dysregulation Disorder
>
> [J.S.], 16, was taken into custody and brought to Bryn Mawr Hospital for a psychiatric evaluation.  He was then brought to Horsham Clinic for further treatment and discharged with further treatment recommendations.
>
> We have engaged in six telehealth sessions starting 12/7/2021 to 12/19/2021.  My conclusions to date are that [J.S.] is suffering from an undiagnosed manic-depressive disorder which has intensified during his teen years.  He exhibits an excess of both manic and depressive cycling symptoms which account for his most recent behaviors and moods.  Examples of these symptoms are: decreased need

---

[7] Email from Jagruti Amin to R.S. (Nov. 26, 2021, 1:34 PM), ECF No. 11-13 at 333; *see also* The Horsham Clinic Discharge Summary (Dec. 2, 2021) at 1, ECF No. 11-13 at 323–26 ("RULE OUT BIPOLAR AFFECTIVE DISORDER").

for sleep, racing speech and thoughts, excessive irritability, verbally aggressive behavior (in reaction to verbal threats,) impatience, poor judgment, an inflated sense of self-importance, anger, worry and anxiety, inability to sleep, and grandiose thinking.

Reading through his internet communications, one notes an initial attempt to intimidate the provocateurs, followed by apologetic statements for his statements.  Similarly, his encounters with the police were initially threatening then immediately submissive; not indicative of a violent person but suggesting a frightened rather than an aggressive person, with a need for self-aggrandizement from the appreciation of others.

Manic-Depressive behavior is typically genetically inherited, triggered both by the genes and the environment.  Presently, it is treated (but not cured) by a combination of medicine, talk therapy, family therapy, and "environmental therapy."  At present, the mood stabilizer he is taking (Abilify) is insufficient and the medication should be re-examined.  (Also, to rule out DMDD, as should the previously diagnosed ADHD.)

In conclusion, given the proper treatment, [J.S.] should be able to function in his present school.[8]

J.S. treated with Dr. Hoeveler six times from January 2021 to May 2022.  On January 16, 2022, Dr. Hoeveler wrote a letter recommending J.S. return to Lower Merion High School, stating:

[J.S.] is under my care.  He has been diagnosed with Bipolar Affective Disorder Type 1.  He is being treated with Abilify 10 mg daily.

As his bipolar disorder is effectively treated at this time, his moods should remain stable, and his moods should not interfere with typical schooling.  He should return to typical school.[9]

---

[8] Psychological Report from Dr. Robert Klein (Dec. 19, 2021), ECF No. 11-13 at 339–40 ["Dr. Klein Dec. 2021 Psych. Report"].

[9] Letter from Dr. Katie Hoeveler (Jan. 16, 2022), ECF No. 11-13 at 350 ["Dr. Hoeveler Jan. 16 Letter"].

She wrote four days later, opining:

> [J.S.] is under my care.  He is diagnosed with Bipolar Affective Disorder 1.
>
> [J.S.'s] potentially threatening comments and behaviors were made while he was in a manic state, a state characterized by grandiosity and delusions, when untreated.   [J.S.] is now adequately treated for his Bipolar Affective Disorder 1, is currently euthymic, and poses no threat.[10]

The November 2021 manic episode and the disciplinary referrals instigated a re-evaluation.   The Evaluation Report ("2022 ER") was prepared by Dr. Tim Edge, the District's psychologist.  Dr. Edge considered information from the parents, Dr. Hoeveler, Dr. Klein, the school records, school personnel, interviews of J.S. and the test results measuring intellectual ability, ability to process information, academic achievement, and social and emotional functioning.

The information Dr. Edge collected from the parents and teachers revealed significantly different assessments of the severity of J.S.'s behavior.   J.S.'s mother reported that her son had not been himself in the months leading up to his manic episode, but the manic behavior "came out of left field."[11]  She admitted to ongoing issues with his behavior, but indicated that she learned how to deal with his minor defiance and stubbornness over the years.  J.S.'s mother also reported that her son's comments, texts, and social media posts during his manic episode were made in self-defense and from a desire to look tough.   She added that he is properly medicated and wants to return to

---

[10] Letter from Dr. Katie Hoeveler (Jan. 20, 2022), ECF No. 11-13 at 351 ["Dr. Hoeveler Jan. 20 Letter"].

[11] 2022 ER at 6.

school.   J.S.'s mother acknowledged that there may be hiccups when he returns and stated her son needs the structure of school.

J.S.'s teachers offered more concerning descriptions of his behaviors.   They described him as defiant, inappropriate, argumentative, and disruptive in class.   For example, J.S.'s U.S. History teacher reported to Dr. Edge that:

> I was able to work with [J.S.] in class up until a couple of weeks ago.  I have had difficult students before and have been able to establish a positive relationship with the student and work with them.  [J.S.] will not listen to me in class or follow instructions.  He does what he wants, this does not work in a structured environment.   He leaves the class without permission and returns when he feels like it.   Currently, I'm very nervous about having [J.S.] in my class.  I'm concerned about my safety and the safety of my students.  I have never felt this way about a student in my 28-year career.[12]

J.S.'s AP Computer Science Teacher offered the following commentary:

> Many of my concerns prior to the social media incident were regarding attendance in class.  [J.S.] was often late to school and missed a lot of classes.  I spoke with him about it and he felt it was more important to stream on Twitch than to be in class and that was why he was missing class in the morning often.  In regards to behavior there was really just one incident where he was inappropriate and disruptive when entering class late.  In addition to that he had missed our Unit 5 test and we spoke about him making it up in the testing center but he never completed it.[13]

J.S.'s physical education teacher indicated that his concerns about J.S. included "argues with others, isolates from others, social anxiety, seeks attention, and highly active."[14]

---

[12] *Id.* at 10.

[13] *Id.* at 11.

[14] *Id.*

Dr. Edge considered information from J.S.'s private psychiatrist and psychologist, including Dr. Hoeveler's two letters and Dr. Klein's psychological report.  Dr. Edge also documented his conversations with them.  Dr. Hoeveler reported that: J.S. "is doing well on medication.  He is ready to come back to school" and "[a]s long as he is medicated, there shouldn't be any safety issues."[15]   During this conversation, Dr. Hoeveler emphasized: "We are on top of it."[16]  When Dr. Edge asked her about J.S.'s understanding of the events, she responded that "[b]ipolar individuals do not have much insight."[17]

Dr. Edge summarized his conversation with Dr. Klein:

> Dr. Klein sees [J.S.] via weekly telehealth sessions.  He indicated a Bipolar diagnosis.  [J.S.] accepts the idea that there was a reason [he] was in a manic condition.  There is a history of this diagnosis in the family.  The Abilify medication was doubled.
>
> [J.S.] reported that he was threatened first by some students at Harriton and that [J.S.'s] motivation for his statements was fear.
>
> When asked about the difficulties [J.S.] had outside of school, Dr. Klein stated that there were "no real battles with cops, [J.S.] has a big mouth, nothing physical."  Dr. Klein believes that [J.S.] should be on Lithium; Abilify has made [J.S.] tired. [J.S.] spent "about a month" at Montgomery Hall (juvenile detention).  He enjoyed himself there, made friends, played chess.  [J.S.] is "very bright."
>
> Dr. Klein contends, "As long as [J.S.] is on medication, there shouldn't be any difficulty."  When asked by Dr. Edge what [J.S.] would do if peers said anything off-putting, Dr. Klein said he has had this conversation with [J.S.]; [J.S.] would walk away now if threatened.

---

[15] *Id.* at 8.

[16] *Id.*

[17] *Id.*

> Finally, [J.S.] had a lot of grandiosity.  He has a "blog on the internet or something like that."   [J.S.] is very persuasive verbally.[18]

The March 2022 ER included input from the school counselor, who reported that J.S. "brought a sharp plastic object that resembled a knife into school"[19] in March 2021. A school representative met with J.S. and discussed the incident with J.S.'s parents who agreed that he would bring in a different object to fidget with in school.  The school counselor also explained that there had been three START referrals on December 2019, January 2021, and October 2021.  According to the school counselor, J.S. was not receptive to help and his mother declined to intervene.  The school counselor also relayed that J.S.'s Biology and English teachers reported that J.S. displayed "changes in behavior, disruptive behavior, physically touching other students without their consent, and mood swings."[20]

During the evaluation process, J.S. took a series of tests designed to measure his cognitive functioning, achievement, information processing, and attention and executive functioning skills.  J.S.'s cognitive functioning tests revealed overall cognitive abilities in the high average range, with fluid reasoning in the superior range and verbal comprehension in the high average range.  Achievement testing demonstrated average reading passage comprehension, sentence reading fluency, and math calculations. When J.S. was asked to write a short essay in ten minutes based on a prompt given by Dr. Edge to assess his written language skills, J.S. stopped writing after two minutes.  He

---

[18] *Id.* at 9.

[19] *Id.* at 11.

[20] *Id.* at 12.

told Dr. Edge that he knew Dr. Edge's motivation in having him write was to get some time to himself.

When tested on his attention and executive functioning skills, J.S. reported "difficulty with some aspects of executive functioning."[21]  Dr. Edge wrote that "[c]oncerns are noted on the following behaviors: **resist impulses and adjust well to changes in environment, people, plans, or demands**.  [J.S.] reports that he 'often' has trouble waiting his turn and he doesn't often think of consequence before acting."[22]

As in past years, J.S., his parents, and his teachers had vastly different assessments of J.S.'s behavioral problems when completing the Behavior Assessment System for Children ("BASC-3").   The BASC-3 is an "integrated system that utilizes behavior rating scales. . . . to facilitate the differential diagnosis and classification of a variety of emotional and behavioral disorders of children and to aid in the design of treatment plans."[23]   J.S., his parents, and three teachers ranked fourteen types of behavior on a numbered scale.   Those behaviors included: hyperactivity, aggression, conduct problems, anxiety, depression, somatization, attention problems, atypicality, withdrawal, adaptability, social skills, leadership, functional communication, and activities of daily living.  BASC-3 participants were also asked to list J.S.'s behavioral and emotional strengths and weaknesses.

J.S.'s mother noted withdrawal, the "[t]endency to evade others, to avoid group activities, or to lack interest in social contact,"[24] in the at-risk range.  J.S.'s father rated

---

[21] *Id.* at 18.

[22] *Id.* (emphasis in original).

[23] *Id.* at 22.

[24] *Id.* at 23.

J.S. in the typical range for all areas.  Mother listed J.S.'s behavioral and emotional strengths as generally optimistic, learns things quickly, good sense of humor, cautious, capable self-learner, good at basketball, and a healthy eater.  Father responded that J.S. is good natured.  When asked about J.S.'s emotional and behavioral concerns, the mother responded:

> We have always been concerned about too much video games but he has been improving on that a lot lately.  The other issue has been biting off nose to spite face with teachers periodically.  The reports have always been that he is generally respectful but he has often stopped trying in a class when he gets annoyed with a teacher.  Almost to punish/annoy the teacher when he is really just hurting himself.  These have generally been isolated incidents and manageable in terms of passing each grade.[25]

Father responded: "The survey answers given were based upon experience from the recent months that preceded this unprecedented health crisis (as well as the additional complications that followed).  Thank you for your understanding and assistance with this circumstance."[26]

J.S.'s responses placed him in the At-Risk range in attitude to school, atypicality, locus of control, and sensation seeking.

J.S.'s Spanish teacher, Pre-Calculus teacher, and U.S. History teacher also completed the BASC-3.  Dr. Edge described the teachers' ratings as "very concerning" and stated that there was "[s]ignificant externalizing behavior, class disruption, and atypical behavioral . . . noted, often in the Clinically Significant range."[27]

---

[25] *Id.* at 24.

[26] *Id.* at 25.

[27] *Id.* at 28.

The Spanish teacher's scores indicated a negative overall view of J.S.  Because the ratings were done shortly after J.S.'s manic episode, some of the ratings may have been particularly amplified.  She described J.S.'s behavioral and emotional strengths as seeking out friendships with his classmates and that he is often unsuccessful because of his aggressive and sometimes unpleasant behavior.  When asked about her concerns, she responded:

> [J.S.] is openly defiant in Spanish class and often disrespectful to me and to his peers.  He seems unaware of how others respond to his behavior and continues even when asked by his peers to stop.  He is work avoidant although he has the capacity to complete his assignments.  He provokes me and the other students for what seems like no reason.  What concerns me most is that there are some days when he is perfectly fine.  It seems like he can control himself but chooses not to.[28]

J.S.'s Pre-Calculus teacher summarized his concerns about J.S. as: "Threatening words and behaviors to peers and teachers.  Constantly looking for attention from others and distracting everyone from learning.  Has no capability in dealing with being wrong.  Cannot overstate the negative impact he had on the learning and the feeling of safety in our classroom."[29]

The history teacher also gave J.S. ratings that triggered a caution warning in interpreting the results.  He wrote that J.S. "is a strong student who can keep up with class work, when he wants to."[30]   When asked about his behavioral and emotional concerns, the teacher offered the following comments:

> When [J.S.] was in class it was very difficult to conduct my US History class.  He would speak out in class regardless of what

---

[28] *Id.*

[29] *Id.*

[30] *Id.*

was going on.  He would get up from his seat and walk around class.  I set up a system with [J.S.] that if he had too much energy he could take a lap in the hallway and come back to class.  [J.S.] started to take his lap and not come back to class.  Since [J.S.] has been out of the class I can teach an uninterrupted lesson; the class is a much improved learning environment.[31]

The March 2022 ER also included a psychiatric evaluation conducted by the District-retained psychiatrist, Dr. Robert Newbrough.  He diagnosed J.S. with Bipolar I Disorder, most recent episode manic, severe, with psychotic features.  Dr. Newbrough provided the following assessment of J.S.:

> [J.S.] is a nearly 17-year-old male who is currently an eleventh grade student at Lower Merion High School.  Prior to November of 2021, [J.S.] had not been displaying highly concerning behaviors or emotional symptomatology.  Given the observations and history that was presented to this examiner on the day of this evaluation, this examiner is of the opinion that [J.S.] is presenting with behaviors and symptoms that are consistent with a diagnosis of Bipolar I disorder.  [J.S.] has displayed distinct periods of abnormally and persistently elevated/expansive moods where he displayed a significant increase in goal directed activities and high levels of energy.  He was displaying grandiose thinking and a significant sense of inflated self-esteem.  Sleep disturbance was present, and it appears that [J.S.] was feeling rested after only having brief periods of sleep.  Pressured speech was at times present along with racing thoughts and distractibility.  [J.S.] was displaying an increase in goal directed activities including having an increased libido.  At times he displayed psychomotor agitation.  While [J.S.] has displayed some impulsivity over the years, he became much more impulsive and exercised very poor judgment during the episodes.  Given the information that was presented, it appears that at times [J.S.] was also experiencing problems associated with reality testing.  At this point, [J.S.] does not appear to be experiencing significant symptoms of depression, and no history of depression was reported during this evaluation.  [J.S.] received treatment, and currently his mood appears to be much more stable.  Problems with reality testing were not

---

[31] *Id.*

observed during this evaluation.   Importantly, during this assessment, [J.S.] reported having no thoughts of wanting to harm himself or others.  In addition, he denied ever having the intent to harm others.[32]

Dr. Edge evaluated J.S. over two sessions.  He observed that J.S.'s behavior varied over the two sessions.  For example, J.S. was "hyper and grandiose for a substantial portion of the first session."[33]  He found that J.S. is a bright student who is academically capable and can be quite personable.  He also noted J.S. "has a history of oppositional behavior, impulsivity, and some executive functioning weakness."[34]  J.S.'s teachers reported disruptive behavior, hindering both J.S.'s and his classmates' ability to access the curriculum.  Dr. Edge opined that J.S. "continues to present with grandiose thoughts at times and lack of awareness of his behavior in classrooms over the years."[35]

J.S. admitted to having issues with authority.  Dr. Edge commented: J.S.'s "own perceptions of his teacher interactions do not match the 4 teacher reports in this Evaluation Report and past teacher interactions."[36]  Dr. Edge added that J.S. "sees others around him as the ones needing to change."[37]

Dr. Edge observed that J.S. acknowledged he has "significant difficulty with resisting impulses and having the ability to stop his own behavior at the appropriate time."[38]  He lacks appropriate coping skills, boundaries, and struggles with problem-

---

[32] *Id.* at 42–43.

[33] *Id.* at 13.

[34] *Id.* at 46.

[35] *Id.*

[36] *Id.*

[37] *Id.* at 47.

[38] *Id.*

solving flexibility.   There is also an ongoing power struggle dynamic with his teachers.
Ultimately, Dr. Edge opined:

> Thus, without more insight into his need for change, along with his negative view towards authority figures, suggests the need for a more intensive therapeutic setting.   [J.S.] requires a program which is academically challenging, but at the same time therapeutic, structured, and supportive.   When increased insight into his behavior is eviden[t], as well as ownership of his contribution to problems he has encountered, and an ability to see things from another's perspective, a return back to a less restrictive setting would be in in [sic] order.   To program for [J.S.] in a public school setting at this time, which lacks an intensive therapeutic support component which he clearly requires at this time in his life, would place him at risk of failure and potentially increased behavioral difficulties.   His medication and therapy supports are an excellent start, but there is a history of behavioral difficulties, lack of reaching potential, and considerable restorative work needed.   [J.S.] responded well to his experience at the Youth Detention Center based on self, parent, and therapist report; this is obviously a highly regimented and structured program. Structure is something that [J.S.] needs right now.[39]

Dr. Edge acknowledged that J.S.'s "doctors are reporting that he is currently doing well as his medication has been adjusted."[40]   He opined that J.S. "will need special education to help support his daily functioning at school and learn how to cope and regulate his emotions."[41]   Dr. Edge added: "The IEP team should give careful consideration for how to support J.S. given the amount of structure he requires, the importance of immediacy of feedback, restorative work needed, and ensuring that therapeutic supports are embedded throughout his school day."[42]

---

[39] *Id.*

[40] *Id.*

[41] *Id.*

[42] *Id.*

Dr. Edge considered all the information provided by the parents, J.S.'s private psychiatrist and psychologist, the school records, school personnel, interviews of J.S. and test results.  After thoroughly reviewing this information, Dr. Edge concluded J.S. was a child with Bipolar Disorder I and an emotional disturbance in need of special education and was qualified to receive it.

The March 2022 ER concluded with psychiatric recommendations from Dr. Newbrough and additional school-based recommendations offered by the District.  Based on his assessment, Dr. Newbrough offered three psychiatric recommendations:

> 1. [J.S.] is in the process of being reevaluated.  When [J.S.] reenters a school-based setting, he will require very close monitoring and support.  [J.S.] will need to develop an increased capacity to mange stress appropriately as exposure to stressors can lead to a recurrence of symptoms of mood instability.  In this examiner's opinion, it would be helpful and important for releases of information be signed so that outpatient providers, [J.S.'s] parents, and school team members can communicate effectively with others.  [J.S.] will need to be monitored very closely with respect to his moods and for the potential return of symptoms of hypomania/mania.  The school team may wish to consider whether or not a modified school schedule would be initially helpful with respect to having [J.S.] adjust more slowly to reentering a potentially challenging school-based setting.  [J.S.], his parents, and those who work with him need to take steps to help [J.S.] remain emotionally balanced.  [J.S.], in this examiner's opinion, will require having access to a strong support system at school.  [J.S.] needs to comply with school-based expectations, rules, and regulations.  [J.S.] will benefit from stability, structure, and stress management interventions.  He needs to develop an increased capacity to self-monitor especially when it comes to the potential re-emergence of serious symptoms of mood instability.
>
> 2. [J.S.] should continue to follow up on an outpatient basis for his psychiatric and psychological needs via his parents' primary insurance benefit plan.  [J.S.] and his parents may wish to share the results of the psychoeducational assessment with appropriate outpatient providers.  As was

noted, in this examiner's opinion, it is important for [J.S.'s] outpatient providers to have access to school-based information and vice versa. [J.S.'s] response to Abilify will require monitoring over time. [J.S.] needs to maintain an appropriate sleep schedule. Sleep related problems/deprivation can lead to the emergence of serious symptoms of mood instability. In this examiner's opinion, [J.S.'s] access to social media needs to be monitored very closely as issues related to social media can be extremely stressful and emotionally destabilizing. [J.S.'s] parents may wish to discuss with his outpatient provider whether or not accessing Medical Assistance Coverage for him based on his individual needs might be beneficial for accessing services like family-based services that are not available via standard insurance benefit plans.

3. [J.S.] should continue to follow up on an outpatient basis for his general medical needs as required.[43]

The District offered additional recommendations:

[J.S.'s] needs require the support of a special education case manager and a system in place to manage his behavior. He has not tapped into his academic potential and may now be more willing to accept help and support. Emotional Support is recommended. [J.S.] will need to establish supportive relationships with adults in the building where he feels safe, can let his guard down, and talk about what he needs. His impulsivity and executive functioning needs should be considered in addition to his Bipolar diagnosis. Moreover, a Functional Behavior Assessment (FBA) should be considered if [J.S.] continues to display behaviors in the classroom.[44]

The District also proposed that accommodations and specially designed instruction include: (1) "[p]referential seating"; (2) "[a]ccess to a quiet and distraction-free testing center"; (3) "[i]ndividual/group counseling for emotion regulation, dealing with anxiety, and coping skills"; (4) "[o]pportunity for breaks"; (5) "[e]xtended time for tests given the possibility of mood dysregulation on a given day and his executive functioning

---

[43] *Id.* at 48.

[44] *Id.*

needs.  In addition, Abilify can cause fatigue"; (6) "[t]he ability to seek support from a mental health professional in the building at any point in the day"; and (7) "[h]ome/school communication regarding behavior and how J.S. is feeling to curb negative behaviors and be cognizant of potential manic flare-ups."[45]

The District concluded that J.S. required intensive therapeutic, emotional, behavioral, and social supports.  Because it could not provide the support needed, the District sent referral packets to potential placements.  Only Lifeworks accepted the placement.  Lifeworks is an accredited academic school in a therapeutic setting.  It is designed to provide the emotional support that J.S. needs.

Rejecting the placement, the parents enrolled J.S. in Fusion Academy, a private school providing one-on-one instruction on February 28, 2022.  In November 2022, without waiving any claims or legal rights, they enrolled J.S. in Lifeworks, the District's proposed out-of-district placement.

## IDEA Standard of Review

The district court conducts a "modified *de novo*" review of the hearing officer's decision.  *J.M. v. Summit City Bd. of Educ.*, 39 F.4th 126, 139 (3d Cir. 2022) (citations omitted).  The district court must give "due weight" and deference to administrative factual findings which are deemed *prima facie* correct.  *Y.B. ex rel. S.B. v. Howell Twp. Bd. of Educ.*, 4 F.4th 196, 197 (3d Cir. 2021) (citing *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 266 (3d Cir. 2014)).  The district court must defer to the findings of those with the educational expertise and not substitute its "own notions of sound educational policy for those of the school authorities."  *K.D. ex rel. Dunn v. Downingtown Area Sch. Dist.*, 904

---

[45] *Id.* at 49.

F.3d 248, 251 (3d Cir. 2018) (quoting *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. Re-1*, 580 U.S. 386, 404 (2017)).

The court must accept the agency's credibility determinations "unless the nontestimonial, extrinsic evidence in the record would justify a contrary conclusion." *J.M.*, 39 F.4th at 145 (quoting *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 243 (3d Cir. 2012)).

### Analysis

The IDEA requires the state to provide every disabled child with a "free appropriate public education." 20 U.S.C. § 1412(a)(1). "The instruction offered must be 'specially designed' to meet a child's 'unique needs' through an '[i]ndividualized education program.'" *Endrew F.*, 580 U.S. at 400 (emphasis omitted) (quoting 20 U.S.C. §§ 1401(29), (14)); *see also T.R. v. Sch. Dist. of Phila.*, 4 F.4th 179, 191 (3d Cir. 2021) (citation omitted). The instruction must prepare the child for "further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A); *see also D.F. v. Collingswood Borough Bd. of Educ.*, 694 F.3d 488, 499 (3d Cir. 2012) (quoting *Ferren C. v. Sch. Dist. of Phila.*, 612 F.3d 712, 717 (3d Cir. 2010)).

Although the state is not required to "maximize the potential of every handicapped child," it must provide an education that confers a "meaningful benefit" to each child. *Blunt*, 767 F.3d at 268 (quoting *Ridley School Dist. v. M.R.*, 680 F.3d 260, 269 (3d Cir. 2012)). The benefit must be substantial, not minimal. *Endrew F.*, 580 U.S. at 402–03.

To achieve a meaningful benefit, the school district must fashion an IEP uniquely tailored for the child. *Id.* at 386 (citing 20 U.S.C. §§ 1401(9)(D), 1412(a)(1)). The IEP must be reasonably calculated to enable the child to make progress "appropriate in light of the child's circumstances." *Id.* at 399. It must "set out a plan for pursuing academic

and functional advancement." *Id.* (citing 20 U.S.C. §§ 1414(d)(1)(A)(i)(I)–(IV)).  The core of the IDEA is the collaborative process between the parents and the school officials to fashion the IEP.  *Id.* at 391 (citing 20 U.S.C. § 1414).  This collaboration ensures careful consideration of the child's individual circumstances.  *Id.*

The IEP's purpose is to establish a plan for each child's academic and functional advancement.  *Id.* at 399–401 (citing 20 U.S.C. §§ 1414(d)(1)(A)(i)(I)–(IV)).  It is developed "only after careful consideration of the child's present levels of achievement, disability, and potential for growth."  *Id.* at 400 (citing 20 U.S.C. §§ 1414(d)(1)(A)(i)(I)–(IV), (d)(3)(A)(i)–(iv)).  It must include a statement of the special education, related services, supplementary aids and services, and program modifications or supports for school personnel that will be provided to enable the child to attain the program's goals. 34 C.F.R. § 300.320(a)(4).  Regular progress monitoring, through periodic progress reports provided to the parents and the IEP team, is critical to a substantively appropriate IEP.  34 C.F.R. § 300.320(a)(3).

In developing the IEP, a school district is not required to provide a specific program or employ a specific methodology requested by the parents.  *See Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 199 (1982) (explaining that the IDEA does not require "the furnishing of every special service necessary to maximize each handicapped child's potential").  Although a school district is required to provide a free appropriate education to a disabled child, it is not required to provide the *best* possible education to maximize educational benefits.  *Id.* at 197 n.21; *Polk v. Cent. Susquehanna Intermediate Unit 16*, 853 F.2d 171, 178 (3d Cir. 1988).  Nor is a school district required

to provide each disabled child with opportunities substantially equal to those afforded to children without disabilities.  *Endrew F.*, 580 U.S. at 403 (citing *Rowley*, 458 U.S. at 198).

*March 2022 IEP*

The District proposed an IEP on March 17, 2022.  It contained a detailed summary of the 2022 ER.  The IEP presented measurable post-secondary goals, participation in state and local assessments, measurable annual goals and objectives, and program modifications and specifically designed instruction ("SDI") for J.S.  It also recommended placement for J.S.

The three transitional goals were aimed at helping J.S. attend college or university, obtain fulltime employment, and live independently.  The IEP identified courses of study, services, and activities supporting each goal.

The IEP included accommodations for state and local standardized tests. Specifically, it proposed giving J.S. additional time to take the Literature and Biology sections of the Keystone Exam in a separate setting, free from distractions.

The IEP included measurable annual goals related to coping, social problem solving, executive functioning, and emotional regulation.  It explained how J.S. would progress to meet each goal, including program modifications for academic, nonacademic, and extracurricular services and activities and specially designed instructions (SDI) to assist him.

J.S.'s program was modified to provide for a "[s]mall student to teacher ratio within a highly regimented and structured environment."[46]  Such an environment would "support

---

[46] Individualized Education Program for J.S. at 36 (Mar. 17, 2022), ECF No. 11-12 at 237–81.

compliance with school based rules and regulations."[47]   J.S. would be provided with preferential seating to minimize distractions; verbal and visual cues to remind him to listen to instructions and begin and complete assignments; immediate feedback, with subsequent restorative work, to process social situations and behavioral choices; positive reinforcement of appropriate social interactions; encouragement to use coping strategies when he is frustrated; cues to help him to prepare for transitions and non-preferred activities; and clear and consistent rules and expectations during the day.

Every day he would be provided strategies for decision making to select alternative responses when confronted with an identified situation that triggers stress, and strategies that guide him through identifying, labeling, and expressing his needs appropriately.   J.S. would also receive daily adult support to monitor all unstructured settings, changes in his mood or his behavioral regulation during structured and unstructured settings.   The monitor would maintain close proximity while in the classroom to provide immediate feedback in response to changes in his mood or behavior, and to support him in real time to process and work toward regulation to reduce negative outcomes.

The IEP also modified J.S.'s program to provide for daily counseling services. These daily services included a 30-minute individual counseling session, a 30-minute group counseling session, a 30-minute check-in, and a 30-minute check-out.

Finally, the IEP recommended a therapeutic out-of-district placement, reasoning that "[a]t this time, [J.S.] is not able to participate in the general education classroom within

---

[47] *Id.*

his home School District.  [J.S.] requires intensive therapeutic, emotional, behavioral, and social supports in order to appropriately meet his needs."[48]

The IEP sets forth program modifications and specially designed instruction (SDI) for J.S.  The location for all modifications and SDI was "To Be Determined."[49]  The modifications and SDI and the frequency with which they would be provided are set forth in the Appendix.[50]

### The Hearing Officer's Final Decision and Order

Several days after the IEP meeting, the parents requested a due process hearing to challenge the District's recommended placement for J.S.  They contend that the IEP inappropriately placed J.S. in a full-time emotional support program in a therapeutic out-of-district placement.  The parents believe their son requires only "an itinerant level of emotional support at the District's high school."[51]  The hearing officer was tasked with resolving the dispute.  The primary issue was "[w]hich of the parties' competing placement options is appropriate for the Student going forward."[52]

The hearing officer conducted a four-day hearing during which nine witnesses testified.  Among the witnesses were J.S.'s treating psychiatrist, the District's psychologist, and a psychiatrist retained by the District to evaluate J.S.  The parties submitted over 1,500 pages of exhibits.  The hearing officer issued his Final Decision and Order on August 26, 2022.

---

[48] *Id.* at 43.

[49] *Id.* at 36–40.

[50] *Id.* at 36–40.

[51] Final Decision at 3.

[52] *Id.* at 3, Issues ¶ 3.

In his thorough and thoughtful decision, the hearing officer conducted a careful review of the 2022 ER and the IEP and made extensive factual findings.  In summary, he found that J.S. had a longstanding history of emotional disturbance, including oppositional and defiant behavior.  J.S. had been repeatedly evaluated and often provided special education services.  Although J.S. has had a relatively successful academic career, there were school years when he had significant absences and struggled to behave in the classroom.  These problems persisted into his middle and high school years, eventually culminating in his November 2021 manic episode.  The hearing officer summarized the information the 2022 ER considered and cited to the 2022 ER's key findings.  He noted that the 2022 ER considered information provided by the parents, a private psychiatrist and a private psychologist who had started working with J.S.  It also included a comprehensive review of school records.

The hearing officer found all nine witnesses credible, stating:

> I find that all witnesses testified credibly in that all witnesses candidly shared their recollection of facts and their opinions, making no effort to withhold information or deceive me.  To the extent that witnesses recall events differently or draw different conclusions from the same information, genuine differences in recollection or opinion explain the difference.[53]

The hearing officer analyzed the District's placement offering and concluded that the District offered a FAPE to J.S.  He opined:

> Through the 2022 IEP and the Private School, the District offered a FAPE to the Student.  I find no procedural or substantive flaw in the 2022 ER, and the 2022 IEP flows directly from, and is directly responsive to, that evaluation.  It is individually tailored to the Student's needs and was

---

[53] *Id.* at 25.

reasonably calculated to provide a FAPE when it was offered.[54]

The hearing officer recognized that although the IEP was not perfect, "perfection is not the standard."[55]  He addressed the shortcomings of the IEP and ultimately concluded:

> . . . the District completed the 2022 ER and offered the 2022 IEP.  While there are some flaws in the 2022 IEP, none of them are fatal.  Moreover, the 2022 IEP flows directly from the 2022 ER and targets the Student's needs through appropriate goals with SDI and modifications tailored to enable the Student to satisfy those goals.  The Private School in which the District offered to implement the IEP is also appropriate and does not constitute a violation of the Student's right to be educated in the least restrictive environment under the facts of this case.  2022 IEP was reasonably calculated to provide a FAPE at the time i[t] was issued.[56]

The parents contend that the hearing officer erred as a matter of law when he concluded that the IEP provided a FAPE in the least restrictive environment ("LRE") for J.S.  The crux of their argument is that the IEP is not tailored to J.S.'s unique needs and circumstances and that he did not need the extensive support provided by the IEP.

*Recommendations of Treating Clinicians*

The parents do not challenge the 2022 Evaluation Report.  Instead, they criticize how the IEP incorporated its results and recommendations.  They contend that the IEP ignored the recommendations of J.S.'s treating clinicians, Drs. Hoeveler and Klein.  They complain that the hearing officer failed to reconcile their opinion that J.S. should return to

---

[54] *Id.* at 35.

[55] *Id.*

[56] *Id.* at 38.

typical school with his conclusion that a therapeutic out-of-district placement is appropriate.

On January 16, 2022, Dr. Hoeveler, J.S.'s treating psychiatrist, opined: "As his bipolar disorder is effectively treated at this time, his moods should remain stable, and his moods should not interfere with typical schooling."[57]  That J.S.'s moods "should remain stable" does not mean that they will.  Likewise, that his moods "should not interfere with typical schooling" does not mean that they will not.

Four days later, Dr. Hoeveler opined: J.S.'s "potentially threatening comments and behaviors were made while he was in a manic state, a state characterized by grandiosity and delusions, when untreated.  [J.S.] is now adequately treated for his Bipolar Affective Disorder 1, is currently euthymic, and poses no threat."[58]

Dr. Edge, the District's psychologist who drafted the evaluation report, considered Dr. Hoeveler's letters and spoke with her.  He noted that Dr. Hoeveler reported that "[J.S.] is doing well on medication.  He is ready to come back to school."[59]  Dr. Hoeveler added that "[a]s long as he is medicated, there shouldn't be any safety issues" and emphasized that "[w]e are on top of it."[60]  When Dr. Edge questioned her on J.S.'s understanding of what happened, Dr. Hoeveler responded: "Bipolar individuals do not have much insight."[61]

---

[57] Dr. Hoeveler Jan. 16 Letter.

[58] Dr. Hoeveler Jan. 20 Letter.

[59] 2022 ER at 8.

[60] *Id.*

[61] *Id.*

The hearing officer acknowledged that the 2022 ER included Dr. Hoeveler's reports.[62]  He noted that her placement recommendation differed from other witnesses, explaining that "genuine differences in recollection or opinion explain the difference."[63]

The record suggests that the hearing officer discounted Dr. Hoeveler's recommendation because she was not in a position to opine on J.S.'s therapeutic needs at that time.  Between January 2022 and May 2022, Dr. Hoeveler had only seen J.S. six times.  Her opinion focused on safety issues.  But, the District did not consider safety an issue in formulating the IEP.  It addressed the level of therapeutic support J.S. required to receive a FAPE.  Dr. Hoeveler admitted that she is "not sure what [J.S.'s] therapeutic goals are.  That's something with him and his psychologist."[64]

Given Dr. Hoeveler's limited contact with J.S., her reluctance to opine on his therapeutic goals and her warning that persons with bipolar disorder have little insight, the hearing officer's assessment of her opinions and recommendation was justified.  He was free to accord it the weight he did.

The parents argue that the IEP also ignored Dr. Klein's recommendations.  The record shows otherwise.  When J.S.'s IEP was developed in March 2022, Dr. Klein had not yet opined on whether J.S. was ready to return to regular schooling.[65]  He did not make that recommendation until May 2022.  Instead, in his December 19, 2021 report,

---

[62] Final Decision & Order at 21, ¶ 114.

[63] *Id.* at 25.

[64] Testimony of Dr. Katie Hoeveler 382:1–3 (May 24, 2022), ECF No. 11-9.

[65] The hearing officer must analyze the appropriateness of the IEP at the time it was issued, not at some later date.  *Carlisle Are Sch. V. Scott P. ex rel. Bess P.*, 62 F.3d 520, 534 (3d Cir. 1995)(quoting *Fuhrmann v. E. Hanover Bd. of Educ.*, 993 F.2d at 1031, 1040 (3d Cir. 1993)).  The appropriateness of the IEP is judged as of the time it was developed.  *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 564–65 (3d Cir. 2010) (citing *Susan N. v. Wilson Sch. Dist.*, 70 F.3d 751, 762 (3d Cir. 1995)).

Dr. Klein opined: "At present, the mood stabilizer he is taking (Abilify) is insufficient and the medication should be re-examined. . . . In my conclusion, given the proper treatment, [J.S.] should be able to function in his present school."[66]  Finding that the Abilify dosage was insufficient and should be adjusted, Dr. Klein did not recommend J.S. return to school at that time.  He predicted that he should be ready to return when the medication was adjusted to the appropriate level to stabilize his mood.

When Dr. Edge spoke with him on January 24, 2022, Dr. Klein expressed that he "believes that [J.S.] should be on Lithium; Abilify has made [J.S.] tired."[67]  Dr. Klein further opined that "[a]s long as [J.S.] is on medication, there shouldn't be any difficulty."[68]  He did not opine that J.S. was stable on medication, but only that he should be once the appropriate dosage was determined.  Contrary to the parents' contention, Dr. Klein did not opine that J.S. should return to Lower Merion High School.  The parents read too much into Dr. Klein's tentative statement.

*Recommendations of the District's Retained Psychiatrist*

The parents claim that Dr. Newbrough, the District's consulting psychiatrist, recommended placement at Lower Merion High School.  They contend that he "made psychiatric recommendations for J.S.'s unique circumstances" and that "[t]here is no evidence that . . . [the] recommendations cannot be implemented with ease at Lower Merion High School."[69]   Contrary to the parents' suggestion, Dr. Newbrough did not

---

[66] Dr. Klein Dec. 2021 Psych. Report.

[67] 2022 ER at 9.

[68] *Id.*

[69] Pls.' Mem. of Law in Supp. of Mot. for J. on the Administrative R. at 6, ECF No. 15-1 ["Pls.' Mem."].

recommend placement at Lower Merion High School.  He merely offered psychiatric recommendations for *when* J.S. returned to typical school.

The hearing officer specifically addressed the issue of J.S.'s placement and whether the District had the resources to implement the therapeutic recommendations. He found:

> The 2022 ER very clearly paints a picture of a child with Emotional Support needs that cannot be met in a typical high school.  The level of therapeutic services that the Student requires to receive a FAPE do not exist in typical high schools, and the District is not obligated to create a school within a school for the Student.[70]

The evidence supports the hearing officer's finding that the District did not have the resources to implement Dr. Newbrough's therapeutic recommendations.  Kelly Printz, an emotional support teacher, testified that certain supports recommended in the IEP could not be implemented in a typical school.  She testified that the District could not provide what the IEP required and only a therapeutic out-of-district placement could.  She explained that Lower Merion High School could not accommodate the "small, student-to-teacher ratio within a highly regimented and structured environment."[71]  Nor could it accommodate "a highly regimented and structured program to support compliance with school-based rules and regulations."[72]  Printz also testified that Lower Merion High School did not have the resources to facilitate "the daily check-in with a mental health professional, and daily check-out prior to dismissal, morning and afternoon check-out with the counselor, and then individual counseling to address his emotionality and distorted

---

[70] Final Decision at 36.

[71] Testimony of Kelly Printz 656:14–18 (July 21, 2022), ECF No. 11-7.

[72] *Id.* 657:22–25.

thinking."[73]  The same is true of the District's inability to provide "adult support to monitor all unstructured settings, including transitions, to monitor changes in mood or his behavioral regulation during structured and unstructured settings, to maintain close proximity while in the classroom setting to support with behavioral regulation to be able to provide immediate feedback towards changes in his mood or behavior, to support [J.S.] in real time to process and work toward regulation to reduce negative outcomes."[74]

The March 18, 2022, Notice of Recommended Educational Placement ("NOREP") confirms that the District considered "[r]egular [e]ducation with supplementary aids and services," but found that J.S.'s "needs exceed what can be provided to him in regular education with supplementary aids and services."[75]  The District also considered "[s]upplemental [e]motional [s]upport at Lower Merion High School with 1:1 adult support throughout his school day."[76]  This option was rejected because "[i]n order to appropriately meet his needs, [J.S.] requires a highly structured educational environment with a high staff-to student-ratio and intensive emotional, behavioral, social, and therapeutic supports that are embedded throughout his school day.  These supports are not able to be appropriately provided in his home school."[77]

The parents do not dispute that the District cannot provide the therapeutic support that the IEP proposed.  Instead, they contend that J.S. does not need that much support.  They maintain that he needs little support and that is available at Lower Merion High

---

[73] *Id.* 660:12–20.

[74] *Id.* 663:16–664:2.

[75] Notice of Recommended Educational Placement/Prior Written Notice (NOREP/PWN) at 3 (Mar. 18, 2022), ECF 11-12 at 290–95 ["NOREP"].

[76] *Id.*

[77] *Id.*

School.  That may be true today,[78] but it was not when the IEP was developed and the hearing officer issued his decision.

*Medication Compliance and Effectiveness*

The parents are correct that the District did not consider that J.S. was adhering to a medication protocol to treat his bipolar disorder when developing J.S.'s IEP.  At that time, there was no definitive evidence that J.S.'s condition was being effectively treated. Indeed, his medication was being adjusted periodically to stabilize his moods.

The hearing officer addressed the parents' concerns, explaining:

> I appreciate the Parents' perspective that the Student's needs in the immediate aftermath of a manic episode are different than what they are typically.  I also appreciate the Parents' and Student's diligence and hard work to maintain the medical and therapeutic supports that the Student requires outside of school while remaining vigilant for the potential onset of a new episode.  The Parents' testimony in this regard was credible, but does not outweigh the comprehensiveness and thorough considerations in the 2022 ER.   Additionally, the record illustrates that the Student had emotional support needs before the manic episode that the District mostly ignored for years.  A full-time, therapeutic, Emotional Support placement is appropriate for the Student.[79]

As we have discussed, there is ample support for the hearing officer's conclusion. He found that "the 2022 IEP flows directly from the 2022 ER."[80]   The opinions and recommendations in the 2022 ER were based on evaluations while J.S. was medicated

---

[78] On February 24, 2023, we issued an opinion explaining why we granted the parents' motions to supplement the administrative record and for a preliminary injunction requiring the District to reinstate J.S. *See* Mem. Op. (Feb. 24, 2023), ECF No. 24.

The additional evidence proffered by the parents showed that J.S.'s needs had changed since the hearing officer's decision.  Indeed, J.S. no longer requires extensive therapeutic support.  For that reason, we found the additional evidence relevant, useful and not cumulative, and admitted it solely for the purpose of considering the motion for a preliminary injunction.

[79] Final Decision at 36.

[80] *Id.* at 38.

but not yet stable.   They suggest that J.S. required a therapeutic, structured, and supportive environment—even when medicated.

For example, Dr. Edge, the District psychologist who prepared the 2022 ER, observed that "in just two testing sessions . . . [J.S.'s] behavior was variable" even while medicated.[81]   J.S. "continues to present with grandiose thoughts at times and lack of awareness of his behavior in classrooms over the years."[82]   Dr. Edge noted that J.S. "sees others around him as the ones needing to change" and "admits to having issues with authority."[83]   Based on his observations,  Dr. Edge opined:

> [W]ithout more insight into his need for change, along with his negative view towards authority figures, suggests the need for a more intensive therapeutic setting.  [J.S.] requires a program which is academically challenging, but at the same time therapeutic, structured, and supportive.   When increased insight into his behavior is eviden[t], as well as ownership of his contribution to problems he has encountered, and an ability to see things from another's perspective, a return back to a less restrictive setting would be in in [sic] order.   To program for [J.S.] in a public school setting at this time, which lacks an intensive therapeutic support component which he clearly requires at this time in his life, would place him at risk of failure and potentially increased behavioral difficulties.   His medication and therapy supports are an excellent start, but there is a history of behavioral difficulties, lack of reaching potential, and considerable restorative work needed.[84]

Dr. Newbrough explained that "*when* [J.S.] reenters a school-based setting, he will require very close monitoring and support."[85]   Dr. Newbrough opined that J.S. "will require having access to a strong support system at school" and "will benefit from stability,

---

[81] 2022 ER at 46.

[82] *Id.*

[83] *Id.* at 47.

[84] *Id.*

[85] *Id.* at 48.

structure, and stress management interventions."[86]  Lower Merion High School or any other typical school could not provide those supports.

*Academic Abilities*

The parents describe their son as a "very intelligent" individual "capable of high[-]level academic work" who "plans on attending a four-year college or university."[87]  They argue that the IEP does not consider J.S.'s intellectual abilities and future goals, citing the lack of honors or foreign language courses at the proposed placement and the disparities between the curriculum at the proposed placement and the District.  According to the parents, the hearing officer agreed.

The hearing officer wrote:

> I also take the Parents' concerns about the Private School's academic rigor seriously.  The Student is highly intelligent and capable of high-level academic work.  Testimony that the Private School has seen success with high academic achievers in the past was credible and not refuted, but that testimony was hardly specific in terms of how the Private School will meet the Student's academic needs.  Technically, the Student does not have academic special education needs, and so the Student's academic program is beyond my authority.  However, I am concerned that the Student's perception of the Private School's academics (real or perceived) will adversely impact upon the Student's Emotional Support and executive functioning needs.  I will, therefore, require the IEP team to reconvene and determine whether the academics provided at the Private School are appropriate for the Student and, if not, whether additional academics or tutoring should be provided (either by the District or a third party).[88]

---

[86] *Id.*

[87] Pls.' Mem. at 6.

[88] Final Decision at 36–37.

No one disputes that J.S. is a bright, academically inclined student, capable of handling a rigorous curriculum.   The record shows that he had a mostly successful academic high school career.

The hearing officer acknowledged the parents' concerns about the academics in his decision.   He directed the IEP team to reconvene and determine whether the academic program at Lifeworks was appropriate.  If the team found it was not, he directed the District provide additional academics or tutoring.   That did not happen because the parents placed J.S. at a private school.

*The Least Restrictive Environment*

The IDEA requires that a disabled student be educated in the "least restrictive environment" capable of providing a meaningful educational benefit.  *D.S.*, 602 F.3d at 556–57 (citing *L.E. v. Ramsey Bd. of Educ.*, 435 F.3d 384, 390 (3d Cir. 2006)); *S.H. v. State–Operated Sch. Dist.,* 336 F.3d 260, 265 (3d Cir. 2003); *see also* 20 U.S.C. § 1412(a)(5)(A).  Placing a student in the least restrictive environment requires a school district to provide the appropriate supplementary aids and services for inclusion in a regular classroom to the greatest extent possible.  *See Carlisle Area Sch.*, 62 F.3d at 535 (citing 20 U.S.C. § 1412(5)(B)).  Mainstreaming does not require inclusion in a regular classroom if doing so would jeopardize a student's ability to achieve a meaningful educational benefit.  Thus, inclusion is not appropriate when the nature or severity of a student's disability precludes an educational benefit from inclusion with non-disabled students by means of supplementary aids and services.  *See* 20 U.S.C. § 1412(a)(5)(A).

The Third Circuit has enunciated a two-part test to determine whether a student has been placed in the least restrictive environment in compliance with IDEA.  *Oberti v.*

*Bd. of Educ. of Clementon Sch. Dist.,* 995 F.2d 1204, 1215 (3d Cir. 1993) (citing *Daniel R.R. v. State Bd. of Educ.,* 874 F.2d 1036, 1048 (5th Cir. 1989)).   The first part asks whether the child can be educated satisfactorily in a regular classroom with supplementary aids and services.  *Id.*  The second part, which comes into play only if it is determined that the disabled student cannot be satisfactorily educated in a regular classroom using supplementary aids and services, assesses the school district's "efforts to include the child in school programs with nondisabled children whenever possible."  *Id.*

In determining whether J.S. can be educated adequately in a regular classroom with the use of supplementary aids and services, three factors are considered: "(1) the steps the school district has taken to accommodate the child in a regular classroom; (2) the child's ability to receive an educational benefit from regular education; and (3) the effect the disabled child's presence has on the regular classroom." *T.R. v. Kingwood Twp. Bd. of Educ.*, 205 F.3d 572, 579 (3d Cir. 2000) (citing *Oberti*, 995 F.2d at 1215–17).[89] These considerations aim to resolve the tension "between the strong preference for mainstreaming, . . . and the requirement that schools provide individualized programs tailored to the specific needs of" the student.  *Oberti*, 995 F.2d at 1214 (internal citation omitted).

The inquiry starts with an examination of the District's efforts to accommodate J.S. in a regular classroom.  A school district must give serious consideration to the student's inclusion in a regular classroom with supplementary aids and services.  Mere token

---

[89] "Additional factors may be relevant depending on the circumstances of the specific case."  *Oberti*, 995 F.2d at 1218 n. 25.  Because the parties have not raised any additional factors, such as cost, only the three *Oberti* factors have been considered.

gestures for the sake of inclusion will not suffice.  *Oberti*, 955 F.2d at 1216.  The steps taken must result in a meaningful educational benefit.

The District did not try to accommodate J.S. in the regular classroom.  But, as the hearing officer noted, "*Oberti* does not require children to fail in inappropriate-but-less restrictive placements before moving to appropriate-but-more restrictive placements."[90] This is particularly true where the District did not have the resources to accommodate J.S. in the regular classroom.  As we have discussed, Printz, an emotional support teacher, testified that the District could not supply the therapeutic supports the IEP prescribed.  Specifically, she explained that the District could not accommodate the structure, therapy and counseling, and supervision that J.S. required.  Only a therapeutic out-of-district placement could.

The NOREP also confirmed that the District did not have the resources to accommodate J.S. in a typical classroom.  It noted that the District considered various placement options, none of which could meet J.S.'s need for "a highly structured educational environment with a high staff-to student-ratio and intensive emotional, behavioral, social, and therapeutic supports that are embedded throughout his school day."[91]

The hearing officer correctly found:

> The 2022 ER very clearly paints a picture of a child with Emotional Support needs that cannot be met in a typical high school.  The level of therapeutic services that the Student requires to receive a FAPE do not exist in typical high schools, and the District is not obligated to create a school within a school for the Student.[92]

---

[90] Final Decision at 36.

[91] NOREP at 3.

[92] Final Decision at 36.

We next consider J.S.'s ability to receive an educational benefit from a regular education.  The inquiry compares J.S.'s ability to receive a meaningful benefit from inclusion in a regular classroom to the benefit he would receive in a therapeutic placement.  The aim is to assure a satisfactory education that includes relating to fellow students as well as course content.  *Oberti*, 955 F.2d at 1216–17.  It also includes "the reciprocal benefits of inclusion to the nondisabled students in the class" who may learn the skills necessary to work and communicate with their disabled peers.  *Id.* at 1218 n.24.  Hence, both the educational benefit and the social benefit must be considered.  *Id.* at 1216–18.

Dr. Edge opined: "While [J.S.] is capable academically, teacher reports of disruptive behavior in the classroom limit both his own and other student's [sic] ability to access the curriculum."[93]

J.S.'s History teacher commented in December 2021:

> [J.S.] will not listen to me in class or follow instructions.  He does what he wants, this does not work in a structured environment.  He leaves the class without permission and returns when he feels like it.  Currently, I'm very nervous about having [J.S.] in my class.  I'm concerned about my safety and the safety of my students.  I have never felt this way about a student in my 28-year career.[94]

J.S.'s AP Computer Science teacher commented in December 2021 that "at times it seemed that [J.S.] did not recognize the difference in how to interact with teachers vs peers."[95]  His Physical Education teacher commented that J.S. "argues with others,

---

[93] 2022 ER at 46.

[94] *Id.* at 10.

[95] *Id.* at 11.

isolates from others, social anxiety, seeks attention, and highly active."[96]  J.S.'s disruptive behavior in the classroom distracted him, interfering with the educational program.

Finally, the effect J.S.'s presence has on the other students in the regular classroom must be considered.  This factor focuses on the District's obligation to educate *all* of its students and recognizes that, even if a disabled student might benefit from inclusion, he "may be 'so disruptive in a regular classroom that the education of other students is significantly impaired.'"  *Id.* at 1217 (citations omitted).  Additionally, the court must consider whether modifying the curriculum to include J.S. "will demand so much of the teacher's attention that the teacher will be required to ignore the other students."  *Id.* (citation omitted).

The evidence shows that J.S.'s classmates were adversely affected by his conduct.  As noted, J.S.'s teachers and Dr. Edge described his disruptive behavior, his inability to get along with classmates, and his disrespect for teachers.  According to the District, J.S.'s behavior limits his classmates' ability to access the curriculum.  J.S. did not understand how his relationship with his teachers was different from that of fellow students.  He viewed himself as superior to his teachers.  He talked out of turn in class, and interrupted and argued with his teachers.  He ignored them and did not follow instructions.  His outbursts made it difficult for teachers to teach.  J.S. often refused to submit assignments.  He left class without permission.  He touched students in class without their consent, engaged in behavior that made them uncomfortable, and distracted them.  When classmates asked him to stop, he did not.  He used profanities in class.  In

---

[96] *Id.*

short, his presence in class was disruptive and prevented the other students from learning.

All three factors of the first prong of the *Oberti* test support the hearing officer's conclusion that J.S. could not be satisfactorily educated full-time in a regular classroom with supplementary aids and services.  Now, the inquiry turns to the District's "efforts to include [J.S.] in school programs with nondisabled children whenever possible."  *Id.* at 1215.

As Printz confirmed, the District did not have the resources to accommodate J.S. in a typical classroom.  The District could not provide "a highly structured educational environment with a high staff-to student-ratio and intensive emotional, behavioral, social, and therapeutic supports that are embedded throughout his school day."[97]  There were three placement options that could meet J.S.'s needs: Lifeworks, Lakeside Academy, and Anderson School.

The District solicited referrals to those schools.  Lakeside Academy and Anderson School declined the referral because they were unable to meet J.S.'s needs.  Lifeworks accepted.

### Tuition Reimbursement

The parents seek tuition reimbursement for J.S.'s placement at Fusion Academy, claiming that the IEP did not offer a FAPE in the LRE.

"The IDEA requires the state to reimburse parents for private school tuition in some situations where the school 'had not made a free appropriate education available to the child in a timely manner prior to that enrollment.'"  *P.P. ex rel. Michael P. v. West Chester*

---

[97] NOREP at 3.

*Area Sch. Dist.*, 585 F.3d 727, 739 (3d Cir. 2009) (quoting U.S.C. § 1412(a)(10(C)(ii)). But, "[n]o reimbursement is required if the school offered a FAPE and the parents placed the child in a private school anyway." *Id.*; *see also* 34 C.F.R. § 300.148(c) ("If the parents of a child with a disability . . . enroll the child in a private preschool, elementary school, or secondary school without the consent of or referral by the public agency, a court or a hearing officer may require the agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made FAPE available to the child in a timely manner prior to that enrollment and that the private placement is appropriate.").

The Supreme Court has articulated a three-step analysis to determine whether parents are entitled to tuition reimbursement under the IDEA. *See Burlington Sch. Comm. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 369–70, 373–74 (1985); *Florence Cnty. Sch. Dist. v. Carter*, 510 U.S. 7, 12–16 (1993). Under the *Burlington-Carter* analysis, the court must determine whether: (1) the proposed IEP constituted an offer of FAPE; (2) the private school placement was appropriate; and (3) equitable considerations weigh for or against reimbursement.

The hearing officer applied the *Burlington-Carter* test to the parents' tuition reimbursement claim. He then concluded that the parents failed the second prong of the test, stating:

> . . . I find no preponderant evidence that the 1:1 School was appropriate for the Student. By and large, the Student has been academically successful. The Student's strong academic performance in a school that presents all instruction 1:1 is neither surprising nor evidence . . . that the 1:1 School is appropriate. There is preponderant evidence in the record that the Student can do well academically even when not receiving a FAPE. But education encompasses much more

> than academics, and the Student's special education needs are not academic in nature.
>
> The 2022 [E]R revealed that the Student needs a very high level of Emotional Support.  No matter how academically successful the Student is, evidence that the Student requires Emotional Support and direct instruction coping skills, social skills, and executive functioning is well beyond preponderant. The Student received no special education at all in the 1:1 School.  For this reason, I find that the 1:1 School was not appropriate for the Student.  The *Burlington-Carter* analysis therefore ends.   The parents are not entitled to tuition reimbursement.[98]

The record supports the hearing officer's conclusion.  Indeed, the opinions and recommendations in the 2022 ER suggest that J.S. required a therapeutic, structured, and supportive environment.  Drs. Edge and Newbrough agreed what therapeutic, structure and support J.S. needed at that time.  Dr. Edge opined that J.S. required a "more intensive therapeutic setting,"[99] one that is not only academically challenging but also offers therapy, structure and support.  This kind of program is not found in a typical high school setting.  Dr. Edge added that J.S could return to less restrictive school setting when he had better insight into his behavior, understood his role in the problems he created, and learned to see things from another person's point of view.  Dr. Newbrough recommended "very close monitoring and support" and "access to a strong support system at school."[100]  He added: J.S. "will benefit from stability, structure, and stress management interventions."[101]

---

[98] Final Decision at 34–35.

[99] 2022 ER at 47.

[100] *Id.* at 48.

[101] *Id.*

The IEP detailed what those therapeutic needs were. J.S. required daily counseling services. Specifically, a 30-minute individual counseling session, a 30-minute group counseling session, a 30-minute check-in, and a 30-minute check-out.

J.S. also needed emotional, behavioral, and social supports. According to the IEP, he required a "[s]mall student to teacher ratio within a highly regimented and structured environment."[102] He needed preferential seating to minimize distractions; verbal and visual cues to remind him to listen to instructions and begin and complete assignments; immediate feedback, with subsequent restorative work, to process social situations and behavioral choices; positive reinforcement of appropriate social interactions; encouragement to use coping strategies when he is frustrated; cues to help him to prepare for transitions and non-preferred activities; and clear and consistent rules and expectations during the day.

The IEP required daily strategies for decision making to select alternative responses when confronted with an identified situation that triggers stress, and strategies that guide him through identifying, labeling, and expressing his needs appropriately. J.S. would also receive daily adult support to: monitor all unstructured settings including transitions; monitor changes in his mood or his behavioral regulation during structured and unstructured settings; maintain close proximity while in the classroom setting to support behavioral regulation to be able to provide immediate feedback about changes in his mood or behavior; and to support him in real time to process and work toward regulation to reduce negative outcomes.

---

[102] IEP at 36.

Fusion did not address J.S.'s needs.  It is undisputed that Fusion does not provide any therapeutic support, counseling, or support services in school.[103]  It has no mental health professionals on staff.[104]  No one with mental health training was at Fusion to monitor J.S.'s moods.[105]  To the extent Fusion provides academic special education services, J.S. was not receiving them.[106]  Importantly, one cannot envision a more restrictive environment than one-on-one instruction with no interaction with peers.

We agree with the hearing officer's conclusion that the parents fail the second prong of the *Burlington-Carter* test.  The record supports his decision that the parents— no matter how good their intentions were—are not entitled to tuition reimbursement for Fusion Academy.

### Intentional Discrimination

The parents assert that the District's failure to educate J.S. in the least restrictive environment establishes that he has been unlawfully excluded from regular education in violation of Section 504 of the Rehabilitation Act.

Section 504 of the Rehabilitation Act bars all federally funded entities from discriminating on the basis of disability.  29 U.S.C. § 794; *J.M.*, 39 F.4th at 146–47 (citations omitted).  In relevant part, Section 504 states that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of . . . his disability, be excluded from the participation in, be denied the benefits of, or be subjected

---

[103] Statement of Undisputed Material Facts Re Def.'s Mot. for Summ. J. on the Admin. R. ¶¶ 158–59, ECF No. 14-1 ["SUMF"]; Pls.' Resp. to Def.'s Statement of Undisputed Facts ¶¶ 158–59, ECF No. 17-1 ["PRSUMF"].

[104] SUMF ¶ 152; PRSUMF ¶ 152.

[105] SUMF ¶ 157; PRSUMF ¶ 157.

[106] SUMF ¶ 160; PRSUMF ¶ 160.

to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).

The regulations implementing Section 504 adopt language from IDEA, requiring that schools receiving or benefitting from federal financial assistance "shall provide a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction."  34 C.F.R. § 104.33(a).  The Third Circuit has confirmed that there are few differences, if any, between IDEA's affirmative duty to provide a free appropriate public education and Section 504's prohibition of discrimination.  *J.M.*, 39 F.4th at 146–47 (citations omitted).  Therefore, because the District *did* offer a free appropriate public education in compliance with IDEA, it did not violate Section 504.

## Conclusion

We conclude that the District's proffered placement offered a free and appropriate public education in the least restrictive environment when it was made.  The parents' unilateral placement in a private school was not.  Therefore, we shall uphold the hearing officer's decision in all respects.